J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TENET CONCEPTS, LLC, | ) | Case No. 18-40270-rfn-11 |
| | ) | |
| Debtor. | ) | Chapter 11 Case |
| | ) | |
| | ) | |

**DEBTOR'S COMBINED RESPONSE TO PLAN OBJECTIONS**

TO THE HONORABLE EDWARD L. MORRIS, UNITED STATES BANKRUPTCY JUDGE:

The Debtor files this *Combined Response to Plan Objections*, and in support states as follows:

1. On November 7, 2018, the Debtor filed the *Plan of Reorganization for Tenet Concepts, LLC* (the "Plan") [Docket No. 142] and *Disclosure Statement in Support of the Plan of Reorganization for Tenet Concepts, LLC* (the "Disclosure Statement") [Docket No. 143].

2. On November 7, 2018, the Debtor filed its *Motion for Entry of Order (A) Conditionally Approving Proposed Disclosure Statement; (B) Scheduling Combined Hearing on Approval of Disclosure Statement and Confirmation of Chapter 11 Plan; and (C) Setting Related Deadlines* (the "Scheduling Motion") [Docket No. 144].

3. On November 8, 2018, the Court granted the Scheduling Motion and entered an order at Docket No. 154 that conditionally approved the Disclosure Statement and set December

14, 2019 as the deadline for objections to the adequacy of the Disclosure Statement or to confirmation of the Plan. The hearing to consider the Plan and Disclosure Statement has been continued to May 30, 2019, and the Debtor's deadline to respond to any objections has been continued to May 23, 2019. See, Dkt No. 246.

4. On December 14, 2018, Triumph Business Capital ("Triumph") filed the *Limited Conditional Objection of Advance Business Capital, LLC d/b/a Triumph Business Capital, to Debtor, Tenet Concepts, LLC's Plan of Reorganization* [Dkt No. 174] (the "Triumph Objection"). The Debtor has a factoring agreement with Triumph. Triumph is the only member of Class 1, but at this time Triumph does not have a claim against the Debtor because all Amazon invoices sold to Triumph by the Debtor have been paid in full. Moreover, on February 8, 2019, the Debtor filed the *First Modification to the Plan of Reorganization for Tenet Concepts, LLC* [Dkt No. 189], which resolved the Triumph Objection.

5. On December 14, 2018, Jeffrey Lines ("Lines") and Willie Mukes ("Mukes") also filed objections to the Plan and Disclosure Statement on behalf of themselves and other putative FLSA collective members. Docket number 176 is the "Lines Objection," and docket number 177 is the "Mukes Objection"].

6. On May 20, 2019, the Court entered orders disallowing proofs of claim filed by Lines and Mukes for themselves and for others similarly situated. See, docket numbers 261, 262, 263 and 264. Those orders and the findings of fact and conclusions of law given from the bench on May 15, 2019 either overrule or moot the Lines Objection and the Mukes Objection.

7. Because the Court has disallowed the Lines individual claim and the Lines collective claim (Class 6) and the Mukes individual claim and the Mukes collective claim (Class 7) in their entirety, the Debtor contends that neither Lines nor Mukes has standing to object to confirmation of the Plan or final approval of the Disclosure Statement.

8. Nevertheless, the Debtor will briefly address each objection. The Lines Objection and the Mukes Objection are substantially similar. They assert the following common objections:

a.    The Plan wrongly provides for Amazon's indemnification claim in article 4.4(a);

b.    The Plan provides that it will not pay collective proofs of claim filed by Lines and Mukes, but only allowed claims filed by individuals (see articles 4.6(a) and 4.7(a));

c.    The Plan's proposal for a payout to Classes 6 and 7 as unreasonably long and inequitable (see articles 4.6(b) and 4.7(b)); and

d.    The amount of the Lines and Mukes claims as described in the Disclosure Statement is too low.

9.    All of the common objections have been overruled or mooted by the Court's recent ruling on claims objections. A copy of the transcript from that ruling is attached as **Exhibit A** and copies of the relevant orders are located at docket numbers 261-265.

10.    As to the objection related to Amazon's indemnity claim, the Court overruled Lines' objection to Amazon's proof of claim. and specifically overruled the argument that the Debtor does not have an obligation to defend Amazon under the indemnity clause in their agreement. **Exhibit A**, Tr. 42:5-12.

11.    As to the objection that the Plan does not provide for payment of claims for the members of a collective action, the Court decided that collective proofs of claim are inappropriate in this case and denied the collective proofs of claim filed by Lines and Mukes. **Exhibit A**, Tr. 16:8-20:5.

12.    As to objections related to the length of the payout for allowed claims in Class 6 and Class 7 of the Plan, since the Court has disallowed all of the claims in Class 6 and Class 7, the objection is moot. **Exhibit A**, Tr. 28:24-32:17 (Lines) and 32:18-34:4 (Mukes).

13.    Finally, the objection that the Disclosure Statement did not correctly state the amount of Lines' and Mukes' individual claims has been overruled by the Court's total disallowance of Lines' and Mukes' individual claims. **Exhibit A**, Tr. 28:24-32:17 (Lines) and 32:18-

34:4 (Mukes).

14.     Lines asserted two additional objections particular to his lawsuit against Amazon as the Debtor's co-defendant.[1]

15.     Lines objects to article 4.6(c) because it stays further prosecution of the Lines Lawsuit as of the Effective Date and provides that the Lines Lawsuit will be dismissed once any Allowed Individual Claim held by Lines is paid in full.  The Court has disallowed Lines' individual claim in its entirety.  Thus, there is no reason for the Lines' Lawsuit to continue either as to the Debtor or as to Amazon.

16.     Finally, Lines objects to Article 12.5, which provides a temporary injunction in favor of Amazon provided that the Debtor is paying Class 6 claims under the Plan.  It says:

> **TEMPORARY THIRD-PARTY INJUNCTION (AMAZON). AS LONG AS THE DEBTOR IS CURRENT ON DISTRIBUTIONS TO CLASS 6 CLAIMS (IF ANY ARE ALLOWED) IN ACCORDANCE WITH THIS PLAN, CLASS 6 CLAIMANTS WILL TAKE NO ACTION FOR THE COLLECTION OF CLASS 6 CLAIMS AGAINST AMAZON.**

17.     As discussed above, all claims in Class 6 have been disallowed.  Those are the claims filed by Lines individually and on behalf of the purported FLSA collective.

18.     Lines' claims against Amazon are derivative of his claims against the Debtor.  He alleges that the Debtor and Amazon are joint employers and therefore jointly liable for his claim.  Given the Court's findings in connection with his claim against the Debtor, Lines can have no claim against Amazon.

19.     Moreover, since the Debtor owes Amazon a duty to defend by virtue of the indemnity clauses in its agreement, enjoining action against Amazon is necessary to the Debtor's ability to reorganize.   A continuation by Lines of litigation against Amazon is, in effect, a continuation of litigation against the Debtor.

WHEREFORE, the Debtor requests entry of an order overruling all objections, granting

---

[1] See, Adversary Proceeding No. 18-4171.

final approval for the Disclosure Statement, confirming the Plan, and granting such other and

further relief as is just and proper.

Dated: May 23, 2019.

Respectfully submitted,

/s/ Laurie Dahl Rea
J. Robert Forshey
State Bar No. 07264200
Laurie Dahl Rea
State Bar No. 00796150
FORSHEY & PROSTOK LLP
777 Main St., Suite 1290
Fort Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
bforshey@forsheyprostok.com
lrea@forsheyprostok.com

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the parties on the attached service list via United States Mail, first class postage prepaid, or via ECF electronic Notice, if available, on May 23, 2019.

/s/ Laurie Dahl Rea
Laurie Dahl Rea

L:\BFORSHEY\Tenet Concepts, LLC (C11) #5927\Pleadings 18-40270-elm11\Combined Response to Plan Objections 5.20.19.docx

# Exhibit A

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                            FORT WORTH DIVISION
 2
     In Re:                        )    Case No. 18-40270-elm-11
 3                                 )
     TENET CONCEPTS, LLC,          )
 4                                 )    Fort Worth, Texas
             Debtor.               )    May 15, 2019
 5                                 )    1:30 p.m.
                                   )
 6                                 )    - RULING - OBJECTIONS TO
                                   )      CLAIMS [95, 145, 146, 147,
 7                                 )      175]
                                   )    - RULING - MOTION TO ESTIMATE
 8                                 )      CLAIMS FOR PURPOSES OF
                                   )      CONFIRMATION [185]
 9                                 )    - SECOND MOTION TO EXTEND
                                   )      DEADLINE TO CONFIRM PLAN
10                                 )      [244]
                                   )    - MOTION FOR AUTHORITY TO
11                                 )      ENTER INTO INSURANCE PREMIUM
                                   )      FINANCE AGREEMENT [251]
12                                 )
                                   )      Excerpt: Rulings
13   _____)
                                   )
14   LINES, et al.,                )    Adversary Proceeding 18-4171-elm
                                   )
15           Plaintiffs,           )    - RULING - DEFENDANT'S MOTION
                                   )      FOR JUDGMENT ON THE
16   V.                            )      PLEADINGS [13]
                                   )    - RULING - MOTION FOR JOINDER
17   AMAZON.COM, INC., et al.,     )      OF AMAZON.COM [15]
                                   )
18           Defendants.           )      Excerpt: Rulings
     _____)
19
                        TRANSCRIPT OF PROCEEDINGS
20             BEFORE THE HONORABLE EDWARD L. MORRIS,
                  UNITED STATES BANKRUPTCY JUDGE.
21
     APPEARANCES:
22
     For Tenet Concepts, LLC,    Laurie D. Rea
23   Debtor:                     J. Robert Forshey (Telephonic)
                                 FORSHEY & PROSTOK, LLP
24                               777 Main Street, Suite 1290
                                 Fort Worth, TX  76102
25                               (817) 877-4224
```

1    APPEARANCES, cont'd.:

2    For Jeffrey Lines and          Holt Major Lackey
     Willie Mukes:                  ELLWANGER LAW, LLP
3    *(Telephonic)*                 8310-1 N. Capital of Texas
                                        Highway, Suite 190
4                                   Austin, TX  78731
                                    (737) 808-2238
5
     For Amazon Logistics, Inc.:    Darren Glen Gibson
6                                   LITTLER MENDELSON, P.C.
                                    100 Congress Avenue, Suite 1400
7                                   Austin, TX  78701
                                    (412) 782-7250
8
     For Tenet Concepts,            Rory Divin
9    Special Counsel:               Russell A. Devenport
                                    MCDONALD SANDERS, P.C.
10                                  777 Main Street, Suite 1300
                                    Fort Worth, TX  76102
11                                  (817) 336-8651

12   Recorded by:                   Tandi Levario
                                    UNITED STATES BANKRUPTCY COURT
13                                  501 W. 10th Street
                                    Fort Worth, TX  76102
14                                  (817) 333-6038

15   Transcribed by:                Kathy Rehling
                                    Transcription Service
16                                  311 Paradise Cove
                                    Shady Shores, TX  76208
17                                  (972) 786-3014

18

19

20

21

22

23

24
              Proceedings recorded by digital sound recording;
25              transcript produced by transcription service.

<u>FORT WORTH, TEXAS - MAY 15, 2019 - 1:44 P.M.</u>

2    (Transcript excerpt begins at 2:01 p.m.)

3    THE COURT:  Does anyone else wish to be heard on the

4  motion for authority to enter into insurance premium

5  financing agreement?  All right.  Well, Ms. Rea, based upon

6  the testimony that's been provided and the circumstances,

7  while not ideal, clearly, to have to ask for retroactive

8  relief, given the particular circumstances here, it's

9  certainly the best of all options that were available.  So I

10  will approve the motion, including the retroactive relief, in

11  relation to the financing agreement.

12    MS. REA:  Okay.  Thank you.  And I'll just upload

13  that order, --

14    THE COURT:  All right.  Very good.

15    MS. REA:  -- if that's all right.  Okay.

16    THE COURT:  All right.  All right.  That takes us to

17  -- we have a number of matters on the schedule.  Let me start

18  by telling you all what I'm not in a position to do today.  I

19  got a little bit ambitious and sort of ran out of time.  And

20  that is that I am not in a position today to provide a ruling

21  with respect to the motion that is pending in the Lines v.

22  Amazon adversary proceeding, which is at Adversary No. 18-

23  4171.  We had the motion for judgment on pleadings that had

24  been filed by Amazon.com, Inc. and the Debtor's effectively

25  adopted motion in relation thereto.  And I just, I will try

1  to get that onto a follow-up schedule as promptly as

2  possible, but just couldn't -- we just couldn't get there.

3      So, and with respect to the main case, Tenet Concepts,

4  Case No. 18-40270, which I'll refer to as the Bankruptcy

5  Case, before the Court in the Bankruptcy Case are the

6  following claims and Claims Objections.  First, Proof of

7  Claim No. 10 filed in the Bankruptcy Case in the name of

8  Jeffrey Lines, who I may sometimes refer to simply as Lines.

9  And that was in his individual capacity to assert a claim

10  against Tenet Concepts, LLC, the Debtor, or Tenet, in the

11  amount of $161,717.50, subsequently reduced to $77,561.18

12  pursuant to a response filed by Lines, which I'll refer to as

13  the Lines Individual Claim, and in relation thereto, the

14  objection filed by the Debtor at Docket No. 95 in the

15  Bankruptcy Case, which I'll refer to as the Lines Individual

16  Claim Objection.

17      Second, Proof of Claim No. 11 filed in the Bankruptcy

18  Case in the name of Jeffrey Lines and Similarly-Situated

19  Amazon Prime Now Delivery Drivers, to assert a claim against

20  the Debtor in the amount of $2 million to $20 million, which

21  I'll refer to as the Lines Collective Claim, and in relation

22  thereto, the objection filed by the Debtor at Docket No. 146

23  in the Bankruptcy Case, which I'll refer to as the Lines

24  Collective Claim Objection.

25      Third, Proof of Claim No. 12 filed in the Bankruptcy Case

in the name of Willie J. Mukes, or Mukes, for short, in his

individual capacity, and, as discovered in a response

subsequently filed by Mukes, purportedly also on behalf of

nine employees who filed opt-in written consents in the

prepetition litigation he commenced against the Debtor, to

assert a claim against the Debtor in the amount of $21,200,

which I'll refer to as the Mukes Individual Claim, and in

relation thereto, the objection filed by the Debtor at Docket

No. 147 in the Bankruptcy Case, which I'll refer to as the

Mukes Individual Claim Objection.

Fourth, Proof of Claim No. 13 filed in the Bankruptcy

Case in the name of Willie J. Mukes and All Other Tenet

Concepts, LLC Former and Current Employees Similarly

Situated, in this case, to assert a claim against the Debtor

in the amount of $2 million, which I'll refer to as the Mukes

Collective Claim, and in relation thereto, the objection

filed by the Debtor at Docket No. 145 in the Bankruptcy Case,

which I'll refer to as the Mukes Collective Claim Objection.

And fifth, Proof of Claim No. 8 filed in the Bankruptcy

Case in the name of Amazon Logistics, Inc., or Amazon

Logistics, in short, to assert a claim against the Debtor in

the amount of $44,992.83 plus such other currently

unliquidated and/or contingent amounts that may become due

and owing to Amazon Logistics under the indemnification

provisions of the work order and terms of service, as such

1  terms are defined in the proof of claim, which I'll refer to

2  as the Amazon Claim, and in relation thereto, the objection

3  filed by Jeffrey Lines for himself and for similarly-situated

4  Amazon Prime Now delivery drivers at Docket No. 175 in the

5  Bankruptcy Case, which I'll refer to as the Amazon Claim

6  Objection.

7      In relation to these matters, I will sometimes refer to

8  the Lines Claim -- I'm sorry, the Lines Collective Claim and

9  the Mukes Collective Claim together as the Collective Claims,

10  and the respective objections thereto as the Collective

11  Claims Objections.  And I will sometimes refer to the Lines

12  Individual Claim Objection, the Lines Collective Claim

13  Objection, the Mukes Individual Claim Objection, the Mukes

14  Collective Claim Objection, and the Amazon Claim Objection as

15  the Claims Objections, collectively.

16      Also pending in the Bankruptcy Case at Docket No. 185 is

17  the Debtor's Motion to Estimate Claims (Proofs of Claim 10,

18  11, 12, and 13) for Purposes of Confirmation, as supplemented

19  by Docket No. 196, which, as so supplemented, I will refer to

20  as the Claims Estimation Motion.

21      Focusing on these Bankruptcy Case matters, the Court

22  conducted a trial on such matters on February 21st and 26th

23  of this year.  Now having reviewed and considered the Claims

24  at issue, the Claims Objections, and the Claims Estimation

25  Motion, along with the parties' respective responses,

1    replies, supplemental filings, and pre- and post-trial

2    briefing filed at Docket Nos. 167, 168, 169, 170, 190, 192,

3    201, 203, 206, 227, 229, 235, and 236, and having also

4    considered the evidence and the arguments and representations

5    of counsel presented at trial, the Court issues the following

6    findings of fact and conclusions of law.

7        First, jurisdiction.  The Court has jurisdiction of the

8    proceedings involving the Claims Objections and the Claims

9    Estimation Motion pursuant to 28 U.S.C. Sections 1334 and

10   157.  Venue of such proceedings in this district is proper

11   pursuant to 28 U.S.C. Section 1409.  The proceedings

12   constitute core proceedings within the meaning of 28 U.S.C.

13   Section 157(b)(2)(A), (B), and (O).  And pursuant to 28

14   U.S.C. Section 157(b)(1) and consistent with the U.S. Supreme

15   Court's opinion in *Stern v. Marshall* and its progeny, the

16   Court has the statutory and constitutional authority to issue

17   final orders on the Claims Objections and the Claims

18   Estimation Motion.

19       Second, a brief overview.  In discussing the Claims and

20   the Claims Objections, I'm going to break them down into the

21   following four categories.  The Collective Claims and

22   Collective Claims Objections, first.  Second, the Lines

23   Individual Claim and the Lines Individual Claim Objection.

24   Third, the Mukes Individual Claim and Mukes Individual Claim

25   Objection.  And fourth, the Amazon Claim and Amazon Claim

1  Objection.

2       With respect to the first three categories of claims and

3  claims disputes, in each case the claims have been asserted

4  against the Debtor for unpaid compensation and other amounts

5  alleged to be recoverable under the Fair Labor Standards Act

6  of 1938, as amended, which is codified at Title 29 of the

7  United States Code, starting at Section 201, which I may

8  sometimes simply refer to as the FLSA.

9       Pursuant to the FLSA, certain protections and rights are

10  afforded to covered nonexempt workers who are in the employ

11  of an employer subject to the FLSA.  In this case, it is

12  undisputed by the parties that the Debtor is an employer

13  subject to the FLSA and that Mr. Lines and Mr. Mukes, and

14  correspondingly, anyone else who might be a party to a

15  collective action initiated by either of them, are covered

16  nonexempt workers for purposes of the FLSA.

17       The two key protections afforded to covered nonexempt

18  employees under the FLSA are the right to receive a minimum

19  wage and the right to receive overtime for hours worked in

20  excess of 40 hours during a given workweek.  More

21  specifically, in relation to this case, pursuant to Section

22  206(a)(1)(C) of the FLSA, employees were required to be paid

23  at least the minimum wage of $7.25 per hour.  And pursuant to

24  Section 207(a) of the FLSA, employees were required to be

25  paid at a rate of not less than one and a half times the

1　regular rate at which such employee was employed for those

2　hours during the workweek worked in excess of 40 hours.

3　　　In addition to these protections, and while somewhat

4　awkwardly included within the definitions section of the

5　FLSA, Section 203(m)(2)(B) of the FLSA specifies that an

6　employer may not keep any of the tips received by an employee

7　for any purpose, regardless of whether or not the employer

8　takes a tip credit in relation to determining whether the

9　employee has received the required minimum wage.

10　　　Adding teeth to these provisions, Section 216(b) of the

11　FLSA provides that an employer who violates the provisions of

12　Section 206, which is the minimum wage provision we just

13　talked about, or Section 207, which is the overtime provision

14　we just talked about, shall be liable to the employee

15　affected in the amount of the employee's unpaid minimum wages

16　or unpaid overtime compensation, as the case may be, and then

17　an additional equal amount as liquidated damages -- in the

18　case of liquidated damages, subject to a possible exception

19　which I'll note in a minute.  The provision goes on to say

20　that an employer who violates Section 203(m)(2)(B), which is

21　the tip provision that we just talked about, shall be liable

22　to the affected employee in the amount of the sum of all such

23　tips unlawfully kept by the employer and any tip credit taken

24　by the employer, and in an additional equal amount as

25　liquidated damages, again, subject to a possible exception.

1     Finally, Section 216(b) also provides for the award of

2  reasonable attorney's fees and costs of the action to a

3  prevailing plaintiff.

4     Turning to the possible exception in relation to

5  liquidated damages, Section 260 of the FLSA provides that if

6  the employer shows to the satisfaction of the Court that the

7  act or omission giving rise to an action to recover unpaid

8  minimum wages, unpaid overtime compensation, or liquidated

9  damages, was in good faith and that the employer had

10  reasonable grounds for believing that its act or omission was

11  not a violation of the FLSA, the Court may, in its sound

12  discretion, award no liquidated damages, or award a lesser

13  amount than would otherwise be provided for in Section 216.

14     Next, before turning to each of the individual categories

15  of claims, it's also helpful to begin with a brief, somewhat

16  truncated chronology of common relevant facts.  Tenet was

17  formed in late January 2015.  It's headquartered in Austin,

18  Texas.  Its initial member was a broker for delivery services

19  that decided to effectively get into the delivery service

20  business through Tenet.

21     Tenet entered into a work order agreement with Amazon

22  Logistics, Inc. effective March 1, 2015.  That's at Debtor's

23  Exhibit 63, along with the work order, and pursuant to the

24  terms of the work order is -- there are related terms of

25  service, which are also included within Debtor's Exhibit 63

1  and are part and parcel of that agreement.

2      As contemplated by the work order and terms of service,

3  the Debtor was to provide delivery services in connection

4  with the delivery of Amazon products to customers.  Of

5  relevance here, the orders would be placed to Amazon directly

6  and then Amazon would then coordinate with the Debtor to

7  provide for those goods to then be delivered to customers.

8      For purposes of obtaining a delivery crew, essentially,

9  to provide those delivery services, the Debtor employed

10  drivers.  And of importance for purposes of determining

11  overtime, the Debtor's workweek commenced on each Sunday and

12  extended through and including the next following Saturday.

13      In or around early October 2015, Mr. Lines was hired by

14  -- a driver for the Debtor to work out of the Debtor's

15  Dallas/Irving, Texas location.  In relation to that location

16  -- I may come back to this later -- the location was

17  essentially an Amazon warehouse that had a designated sort of

18  isolated bullpen area.  Not isolated, but the employees of

19  the Debtor were effectively fenced into a bullpen area and

20  did not have free access within the warehouse.  So, in other

21  words, they could not roam around where the merchandise was

22  actually located.  They would have to pick up the merchandise

23  at, essentially, a delivery window, and then would go from

24  there to make the deliveries.  This is -- I'm using this in

25  reference to the Dallas/Irving location.

1      In the case of Dallas, the delivery drivers would

2  typically use their own vehicles to provide the delivery

3  services.  The Debtor also had locations in, among other

4  places, Austin and Houston, and for purposes of this

5  proceeding -- I shouldn't say Austin.  I'm not sure about

6  that.  But certainly with respect to Houston.  And in the

7  case of Houston, the delivery services were sometimes

8  provided by a personal vehicle but mostly by Debtor's

9  vehicles or at least debtor-supplied vehicles that would be

10  picked up at a D&M Leasing location within virtually two to

11  three minutes of the location of the Amazon warehouse where

12  they would pick up the merchandise.

13      Kind of going through chronologically some key dates, in

14  Dallas, the Prime Now delivery service, which was what was

15  being provided by the Debtor for Amazon, was terminated by

16  Amazon effective February 16, 2016 as a result of Amazon's

17  decision to move away from that type of service.  As a

18  result, the Debtor laid off all remaining driver employees at

19  that point in time.

20      In the summer of 2016, Mr. Mukes was hired.  Later, on

21  February 2, 2017, Mr. Lines commenced the litigation against

22  the Debtor and Amazon.com, Inc. in the Western District --

23  the Federal Western District of Texas court.  On March 3,

24  2017, Mr. Mukes commenced the litigation against the Debtor

25  in the Federal Court for the Southern District of Texas.  In

1    each case, those cases were initiated as collective actions

2    under the terms of the FLSA.

3        On April 1, 2017, Mr. Mukes filed a written opt-in

4    consent in the -- oh, let me back up.  The litigation

5    commenced by Lines, I'll simply refer to as the Lines

6    Litigation, and the litigation that was commenced by Mr.

7    Mukes, I'll simply refer to as the Mukes Litigation.  In

8    reference to the Mukes Litigation, on April 1, 2017, Mr.

9    Mukes filed an opt-in consent to his being a party plaintiff

10   to that case.  On June 23, 2017, Valerie Miller filed a

11   written opt-in consent in the same action.  And then on July

12   19, 2017, eight additional individuals filed written opt-in

13   consents to join that litigation.  And those individual

14   consents were submitted as exhibits, submitted into evidence

15   as exhibits.  I believe it is Debtor's Exhibit 2 or 3.

16       On January 25, 2018, the Debtor filed its voluntary

17   petition for relief under Chapter 11 of the U.S. Bankruptcy

18   Code, initiating the Bankruptcy Case.  Prior to the

19   initiation of the Bankruptcy Case and as a result of the

20   institution of the automatic stay, no written opt-in consents

21   had been filed in the Lines Litigation.  And no other written

22   opt-in consents had been filed in the Mukes Litigation other

23   than as I had indicated.  And for simplicity purposes, I'll

24   refer to the nine individuals other than Mr. Mukes who filed

25   written opt-in consents in the Mukes Litigation as simply the

1   Nine Mukes Litigation Opt-Ins.

2        In connection with the bankruptcy filing, a court-

3   instituted deadline for the filing of nongovernmental proofs

4   of claim in the Bankruptcy Case was established as June 7,

5   2018.  In relation to that deadline, the Debtor -- and I

6   believe that the bar date notice, well, what I'll refer to as

7   the court-issued notice of the Chapter 11 Bankruptcy Case,

8   which set out that deadline that I'll refer to as the Bar

9   Date Notice, was filed in the Bankruptcy Case at Docket No.

10  12, of which the Court takes judicial notice.

11       As evidenced by Debtor's Exhibit 3, on February 28, 2018,

12  the Bar Date Notice was served on, among others, current and

13  former employees of the Debtor.  By the time of the bar date

14  in this case of June 7, 2018, each of the claims at issue

15  pursuant to this ruling were -- had been timely filed in the

16  Bankruptcy Case.

17       All right.  Turning to the Collective Claims and the

18  Collective Claims Objections, the Debtor's primary objection

19  to each of the Collective Claims is procedural in nature --

20  namely, that each of the Collective Claims is an improper

21  "class claim" for which the respective putative class

22  representative -- namely, Lines in the case of the Lines

23  Collective Claim and Mukes in the case of the Mukes

24  Collective Claim -- did not have authority to file.

25       In support of the objections, the Debtor argues that (a)

Bankruptcy Rule 3001(b) requires a proof of claim to be

executed by the actual creditor or the creditor's authorized

agent; and (b) neither Lines nor Mukes is an authorized agent

for any of the putative class members, given that, one,

neither Lines nor Mukes obtained class certification, even on

a conditional basis, in their respective litigation cases

prior to the bar date.  Two, outside of Mukes and the Nine

Mukes Litigation Opt-Ins in relation to the Mukes Litigation,

no employee filed a written opt-in consent to join either the

Lines litigation or the Mukes litigation prior to the bar

date.  And three, neither Lines nor Mukes obtained

authorization to file a class claim on behalf of the putative

class prior to the bar date.

     The Debtor further argues that each of the potential

class members received separate notice of the bar date and

had the opportunity to and should have participated in the

bankruptcy process by filing his or her own proof of claim if

such a potential class member had a claim against the Debtor.

     Lines and Mukes, on the other hand, argue that the type

of notice provided to potential class members in an FLSA

collective action is more informative and meaningful and that

the Bar Date Notice in the Bankruptcy Case was insufficient

to give potential class members an opportunity to assert a

claim.  And they further argue that the class claims had been

-- they further argue that class claims have been permitted

1  in bankruptcy cases in the past and they should similarly be

2  permitted here under the same type of protocol utilized in

3  relation to Rule 23 class action certifications, which the

4  Federal Rules of Bankruptcy Procedure contemplate as being

5  made applicable to contested proceedings pursuant to

6  Bankruptcy Rules 9014 and 7023, that those same protocol be

7  used here.

8      The Court agrees with the Debtor's position on this and

9  will disallow the Collective Claims as procedurally and

10  substantively unauthorized.

11      First, that the claims are unauthorized to the extent not

12  duplicative.  In the case of Mukes and the Nine Mukes Opt-

13  Ins, Litigation Opt-Ins, the claims are duplicative of the

14  Mukes Individual Claim.  In other words, to the extent

15  there's any suggestion that by Mukes and the Nine Mukes

16  Litigation Opt-Ins having filed their written consents prior

17  to the bar date effectively giving some rights in Mr. Mukes

18  to be able to assert their claims, he is already recognized

19  in reference to his individual claim that he was filing

20  claims on behalf of each of those Nine Mukes Litigation Opt-

21  Ins, and therefore the Collective Claim is duplicative of his

22  Individual Claim in any event.

23      In the case of Lines, solely with respect to Mr. Lines,

24  the Collective Claim is duplicative of the Lines Individual

25  Claim.  Again, sort of similar but different reasoning in the

1   sense that Mr. Lines has separately filed his own proof of

2   claim and therefore, to the extent that the Collective Claim

3   incorporates his own claim, it's duplicative of his

4   Individual Claim.

5        In all other respects, the Collective Claims were not

6   authorized -- or, Lines and Mukes were not authorized to file

7   the Collective Claims on behalf of any other potential class

8   members.

9        The Court notes that, unlike a class action under Rule 23

10  where putative class members are automatically in unless they

11  opt out, the putative class members of a collective action

12  under Section 216(b) of the FLSA must affirmatively opt in

13  with a written consent filed in the collective action

14  litigation in order to be considered part of the collective

15  class.

16       The distinction between these two very different types of

17  proceedings is noted by the Fifth Circuit in the case of

18  *LaChapelle v. Owens-Illinois, Inc.*, which is at 513 F.2d 286,

19  a 1975 case, and has also been noted in the local case of

20  *Songer v. Dillon Resources, Inc.*, which is at 569 F. Supp.2d

21  703, a Northern District of Texas case, 2008.

22       Second, the Court is not persuaded by the differences in

23  noticing.  Just as there are legitimate FLSA objectives at

24  stake in relation to FLSA class notifications, there are also

25  legitimate bankruptcy objectives in relation to bar date

1    notices.  In fact, where an FLSA collective claim notice is,

2    by its nature, limited to the nature of the types of claims

3    applicable to the putative class, a bankruptcy bar date

4    notice is unlimited in scope and enables a potential claimant

5    to assert any claim that he or she believes she has against

6    the debtor, irrespective of its nature or scope and

7    irrespective of whether it is currently unliquidated and/or

8    contingent in nature.

9         Here, all putative class members have had an opportunity

10   to participate in the bankruptcy by timely filing a proof of

11   claim.  And to the extent that they did not avail themselves

12   of that opportunity, it is not now appropriate to provide a

13   do-over via a yet-to-be-recognized collective FLSA class

14   mechanism.

15        Third, moreover, any request for class certification at

16   this stage of the proceedings is untimely.  Keying off of

17   Rule 23 and the ability to make Rule 23 class processes

18   applicable to contested proceedings pursuant to Bankruptcy

19   Rule 9014, in *Teta v. Chow (In re TWL Corp.)*, which is at 712

20   F.3d 886, a Fifth Circuit 2013 case, the Fifth Circuit

21   adopted the following factors for consideration by a court in

22   determining whether to make Rule 23 applicable to a contested

23   proceeding.  And this is before any consideration of whether

24   to actually certify a class pursuant to Rule 23.

25        First, whether the class was certified prepetition.

1    Second, whether the members of the putative class received

2    notice of the bar date.  And third, whether class

3    certification would adversely affect the administration of

4    the case, especially if the proposed litigation would cause

5    undue delay.  And the Court also stated that it is

6    appropriate to consider the benefits and costs of class

7    certification to the estate.

8         Each of these factors weighs against opening the claims

9    process to a potential class proceeding, whether under Rule

10   23 or otherwise by analog.

11        First, no class was certified, even conditionally,

12   prepetition.

13        Second, members of the putative class received notice of

14   the bar date in this case, thereby providing them an

15   opportunity to participate in the bankruptcy by timely filing

16   a proof of claim.

17        Third, class certification at this late stage in the

18   proceedings will adversely affect administration of the

19   estate.  This is a small business debtor case, which carries

20   with it certain more-stringent deadlines.  In particular,

21   specific plan confirmation deadlines are imposed pursuant to

22   Sections 1121(e) and 1129(e) of the Bankruptcy Code.

23        Given the aging of this case and such time limitations,

24   an opening-up of the claims process to a whole new potential

25   class certification and notice process is a nonstarter.

1  Moreover, such a process would not only provide virtually no

2  benefit to the estate, it would result in substantial

3  additional costs to the estate.

4      For all these reasons, the collective claims are

5  procedurally and substantively infirm and must be disallowed.

6      I'll also point to the case of *In re Vanguard Natural*

7  *Resources, LLC* at 2017 WL 5573967.  It's a well-written Judge

8  Isgur opinion out of the Bankruptcy Court for the Southern

9  District of Texas issued on November 20, 2017.

10      Turning to the Lines Individual Claim, let me start with

11  a recap of amounts asserted pursuant to that claim.  The

12  Lines proof of claim is, frankly, bereft of detail, only

13  asserting that the claim is for damages allowable under the

14  FLSA.  However, in Lines' response to the Debtor's claim

15  objection, he provides greater clarity, asserting that the

16  Debtor violated the FLSA by failing to pay him for "off the

17  clock" work of $638.90, unreimbursed expenses of $6,500.88,

18  overtime of $105.13, and undistributed tips of $4,163.77.

19  And based upon the foregoing, he also asserts that he should

20  recover an additional aggregate sum of such amounts totaling

21  $11,408.68 as liquidated damages, plus attorney's fees of

22  $20,175.

23      Additionally, Lines asserts that following his complaints

24  to the Debtor about the Debtor's failure to properly

25  compensate him and others, he was constructively fired, in

1   violation of Section 218(c) of the FLSA, entitling him to

2   compensation of $34,161 in lost wages.

3       In the case of the "off the clock" work, the focus is on

4   three categories of allegedly uncompensated time:  (a) the

5   roughly 15 minutes or thereabouts of time spent prior to

6   formally clocking in spent on organizing Amazon bags and

7   generally cleaning up around the bullpen area; (b) the 30-

8   minute lunch break time which Lines asserts was not honored

9   by the Debtor; and (c) the roughly upwards of 30 minutes at

10  the end of a shift after clocking out spent on organizing

11  Amazon bags and generally cleaning up around the bullpen

12  area.

13      The argument here is that the failure to pay impacts both

14  the minimum wage obligation and also, as applicable, overtime

15  calculations.

16      In the case of unreimbursed expenses, the gist of Lines'

17  argument is that he was not properly and/or adequately

18  reimbursed for mileage, gas, and tolls in using his car for

19  deliveries, which also has the effect, when deducted from the

20  compensation paid, of reducing the compensation level below

21  minimum wage.

22      Overtime and undistributed tips are obvious by their

23  nature.

24      And in the case of the retaliatory discharge claim,

25  Section 218c(a) of the FLSA provides that no employer shall

1  discharge or in any manner discriminate against any employee

2  with respect to his or her compensation, terms, conditions,

3  or other privileges of employment because the employee has

4  taken one or more of the following actions, which are

5  generally referred to as protected activities: (1) received

6  a credit under Section 36B of Title 26 or a subsidy under

7  Section 18071 of Title 42; (2) provided, caused to be

8  provided, or is about to provide or cause to be provided to

9  the employer, the federal government, or the attorney general

10  of a state information relating to any violation of or any

11  act or omission the employee reasonably believes to be a

12  violation of any provision of the FLSA; (3) testified or is

13  about to testify in a proceeding concerning such an FLSA

14  violation; (4) assisted or participated or is about to assist

15  or participate in such a proceeding; or (5) objected to or

16  refused to participate in any activity, policy, practice, or

17  assigned task that the employee reasonably believed to be in

18  violation of any provision of the FLSA, or any order, rule,

19  regulation, standard, or ban under the FLSA.

20      At issue in this case is Category 2, providing to the

21  employer information about any violation of or any act or

22  omission the employer reasonably believes to be a violation

23  of any provision of the FLSA.

24      In considering a retaliatory discharge claim under the

25  FLSA, the Fifth Circuit, in *Hagan v. Echostar Satellite, LLC*,

which is at 529 F.3d 617, a 2008 opinion, has opined that the

standards and shifting burden of proof are essentially

identical to the standards -- I'm sorry, in an FLSA

retaliatory discharge claim are essentially identical to the

standards and shifting burden of proof applied from the

Supreme Court's *McDonnell Douglas* case to discrimination

claims under Title VII.

Specifically, the plaintiff must first make a *prima facie*

showing of, one, participation in protected activity under

the FLSA. Two, an adverse employment action. And three, a

causal link between the activity and the adverse action.

Second, if the plaintiff meets such burden, then the

burden shifts to the defendant to articulate a legitimate,

nondiscriminatory reason for the adverse action.

And third, if the defendant meets such burden, then the

burden shifts back to the plaintiff to have to demonstrate

that the proffered reason by the defendant is a pretext for

discrimination.

In this context, a few additional points are worth note.

First, within the Fifth Circuit, an "adverse action" for

purposes of this analysis requires proof of an "ultimate

employment decision" by the employer. For example, rude

treatment, criticism of work and conduct, and even threats of

potential dismissal, verbal reprimands, or low evaluations

will not, at least in isolation, constitute an ultimate

1  employment decision.  For that proposition, *see Connor v.*

2  *Celanese, Ltd.* at 428 F. Supp.2d 628.  It's a 2006 Southern

3  District of Texas opinion.

4      That said, constructive discharge can constitute an

5  ultimate employment decision, but the bar is high.  As

6  further explained in *Connor*, citing the Fifth Circuit's case

7  of *Barrow*, which is at 10 F.3d 292, a 1994 Fifth Circuit

8  opinion, to show constructive discharge an employee must

9  offer evidence that the employer made the employee's working

10 conditions so intolerable that a reasonable employee would

11 feel compelled to resign.  And in evaluating whether such a

12 feeling is reasonable, the following factors are relevant.

13 Or the following facts might have relevance.  One, whether

14 there was demotion.  Two, whether there was a reduction in

15 salary.  Three, whether there was a reduction in job

16 responsibilities.  Four, whether there was a reassignment to

17 menial or degrading work.  Five, whether there was a

18 reassignment to work under a younger supervisor.  Six,

19 whether there was badgering, harassment, or humiliation by

20 the employer calculated to encourage the resignation.  Or

21 seven, whether there was offers of early retirement or

22 continued employment on terms less favorable than the

23 employee's former status.

24      On this, *see also Tyler v. Union Oil Co. of California* at

25 304 F.3d 379, a Fifth Circuit 2002 opinion which is in the

1   context of an ADEA case, but also relevant.

2        Turning to the Debtor's claim objection, the Debtor

3   asserts that the claim is disallowable in full pursuant to

4   Section 502(b)(1) of the Bankruptcy Code that provides for

5   the disallowance of a claim to the extent that the claim is

6   unenforceable against the debtor and property of the debtor

7   under any agreement or applicable law for a reason other than

8   because such claim is contingent or unmatured.

9        More specifically, the Debtor asserts that there's no

10  factual basis for any of the alleged categories of

11  uncompensated time; that the Debtor had a fixed lunch break

12  policy that was both published to employees and of which

13  employees were reminded in memos and stand-up presentations

14  would be deducted from their compensation; that the Debtor

15  had a fixed expense reimbursement policy that sufficiently

16  approximated and reimbursed, if not exceeded, any expenses

17  actually incurred -- namely, the addition of $3.25 per hour,

18  and $4.88 per hour in the case of overtime, to cover

19  reasonable expenses; and that all tips paid by customers were

20  passed through to the employees without exception.

21        Consequently, the Debtor further asserts that there's no

22  basis for any award of liquidated damages or attorney's fees,

23  and further argues that even if there were any compensable

24  amounts determined to be owing, that liquidated damages

25  should not be awarded on account of the Debtor's good faith

1    belief that it was operating in compliance with the FLSA

2    based upon the Department of Labor FLSA audit findings

3    delivered in May 2015.

4        The Debtor further challenges the claim, or at least the

5    vast majority of the claim, on the basis of limitations.  In

6    this regard, pursuant to Section 255(a) of the FLSA, the

7    limitations period applicable to a claim under the FLSA is

8    two years after the cause of action accrues, except that in

9    the case of a cause of action arising out of willful

10   violation, the limitations period is three years after the

11   cause of action accrues.

12       Here, the Debtor asserts that there's no basis for

13   application of the three-year limitations period because

14   there was no willful violation -- again, highlighting the

15   Department of Labor audit.  For purposes of the three-year

16   limitation standard, however, for such extended period to

17   apply, the employee must show that the employer either knew

18   or showed reckless disregard for the matter of whether its

19   conduct was prohibited by statute.  And that comes from

20   *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, a 1988 Supreme

21   Court opinion.

22       For purposes of determining the date of accrual of a

23   cause of action, the Fifth Circuit has explained in *Halferty*

24   *v. Pulse Drug Co., Inc.* at 821 F.2d 261, a 1987 Fifth Circuit

25   case, as modified on other grounds by 826 F.2d 2, also a 1987

1  opinion, that a cause of action accrues at each regular

2  payday immediately following the work period during which the

3  services were rendered for which the wage or overtime

4  compensation is claimed.

5  With this in mind, Section 256 of the FLSA also details

6  when an action is deemed commenced for purposes of the FLSA

7  -- *i.e.*, for purposes of determining whether the action has

8  been commenced prior to the running of the applicable

9  limitations period.  It provides that an action is deemed

10  commenced for purposes of the limitations provisions of

11  Section 255 when the complaint is filed, except in the case

12  of a collective action under the FLSA it shall be considered

13  to be commenced in the case of any individual claimant in

14  such a collective action (a) on the date when the complaint

15  is filed, if he or she is specifically named as a party

16  plaintiff in the complaint and has written consent to become

17  a party -- and a written consent to become a party plaintiff

18  is filed on such date in the court in which the action is

19  brought; or (b) if such written consent is not so filed or

20  his name did not so appear as a party plaintiff, then on the

21  subsequent date on which such written consent is filed in the

22  court in which the action was commenced.

23  Thus, in a collective action, while the provisions of

24  Section 256 may seem counterintuitive and perhaps even

25  draconian or unfair, the actual named plaintiff is not even

1  deemed to have commenced the action for purposes of the FLSA

2  until he or she files an actual written consent to be a named

3  plaintiff in the action.  On this, *see also Espinosa v.*

4  *Stevens Tanker Division, LLC*, 2017 WL 6021861, a Western

5  District of Texas opinion, December 5, 2017.

6      Thus, because Lines did not file a written consent in the

7  Lines Litigation at any time prior to the bankruptcy filing,

8  the Debtor asserts that all claims for unpaid compensation,

9  other than a claim for unpaid tips in relation to his last

10  paycheck, are barred by the two-year limitations period.

11      Finally, in relation to the retaliatory discharge claim,

12  the Debtor asserts that Lines tendered his resignation

13  effective January 2, 2016 via a text to his supervisor, Steve

14  Hoeppner, at the company, and that when Mr. Hoeppner passed

15  that along to his superiors, the company then took action

16  based upon the text.

17      But even if the Debtor were found to have wrongfully

18  discharged Lines, the Debtor further asserts that no amounts

19  are compensable for the period after February 16, 2016

20  because it was on that date that all remaining Dallas drivers

21  were laid off on account of Amazon's decision to terminate

22  its delivery services through the Debtor.

23      With those thoughts in mind, and for the following

24  reasons, the Court will sustain the Debtor's objection.

25  First, at a high level, the Court finds that Lines has failed

1    to meet his burden of proof on establishing the validity of

2    the unpaid compensation claims.

3         Let me start with the "off the clock" work.  First, I did

4    not find credible any indication that the Debtor actually

5    required Lines to sort bags or clean up in advance of or

6    following his shifts.  I think, frankly, that initially Lines

7    wanted to be seen as a team player, and that he only decided

8    to complain about the time once his relationship with the

9    company began to sour once he felt as though his complaints

10   weren't being paid attention to or addressed.

11        Even so, the sorting of bags and cleaning up was not an

12   integral and indispensable part of his principal activity of

13   serving as a delivery driver for the Debtor, and therefore

14   such preliminary and post-liminary activities are

15   noncompensable under the provisions of Section 254(a)(2) of

16   the FLSA and the case of *Integrity Staffing Solutions, Inc.*

17   *v. Busk*, which is at 135 S. Ct. 513, a 2014 opinion.

18        Second, with respect to lunch breaks, the Debtor clearly

19   and unambiguously articulated a policy of requiring a 30-

20   minute meal break during the course of a full-day shift, and

21   clearly and unambiguously communicated to employees that the

22   30-minute period would be uncompensable.  While there is no

23   doubt that the pressure associated with making any particular

24   delivery within the Prime Now two-hour time delivery period

25   and with making a fixed number of deliveries during a shift

was daunting, there is no indication that Lines was truly denied the opportunity to take such a break, even though he may have felt the pressure of the time crunch.

What is clear is that dispatchers were expressly tasked with the job of trying to assist the drivers in earmarking a 30-minute break between deliveries, and there is insufficient evidence to believe that the same did not occur.  And in the case of any lunch break that was not taken by Mr. Lines, that was a decision unilaterally made by him as to how he so desired to use his time and is not properly allocable to the company, in violation of the company's expressly-articulated policy.

Turning to unreimbursed expenses, the Debtor sufficiently established a reasonable basis for the methodology that it developed for compensating employees for car and gas and toll expenses.  And, frankly, insufficient evidence was presented to establish that Lines was compensated at a level below minimum wage on account of unreimbursed expenses after payment of the hourly expense reimbursement.

Third, overtime.  The overtime dispute simply appears to be an unfortunate misunderstanding as to how time would be allocated and paid for whenever a workweek straddled two different pay periods.  In the end, the evidence sufficiently supports that Lines was properly paid for the overtime he accrued.

1    Tips.  As for tips, Lines failed to meet his burden of

2    proving that he did not actually receive all tips paid by

3    customers for his benefit.  While customers were encouraged

4    to provide a base tip of $5 on any particular delivery in

5    paying through the Amazon app, that obviously doesn't

6    necessarily mean that any particular customer actually did

7    so.  The only concrete evidence submitted on tips was the

8    evidence of the amounts disbursed by Amazon and thereafter

9    distributed in full to the employees based upon the data

10    supplied by Amazon.  Nothing more than speculation was

11    presented in an effort to rebut the validity of the data

12    obtained by the Debtor on tips and utilized in paying Lines

13    and others.

14    Next, limitations.  Putting aside Lines' retaliatory

15    discharge claim, I also find that all of Lines' claims, other

16    than with respect to his claim for unpaid tips tied to his

17    final paycheck, are barred by the two-year limitations period

18    of the FLSA.  Because I do not find any willful violation of

19    the FLSA occurred, a three-year limitations period is not

20    applicable.  And here, it is clear that the Lines Litigation

21    was commenced as a collective action and Lines never filed a

22    written consent to join the action prior to the Debtor's

23    filing of bankruptcy and the imposition of the automatic

24    stay.

25    Turning to retaliatory discharge, as to this claim I find

that no adverse employment action was taken by the Debtor
because Lines unilaterally communicated -- decided and
communicated that he had decided to quit rather than being
terminated. But even if he were treated as having been
constructively discharged and that he had satisfied a *prima*
*facie* retaliatory discharge case, I find that the Debtor met
its burden in substantiating the basis for his discharge on
account of sending the text message that he quit and on
account of what may have been the growing friction that was
developing based upon Lines' own misbelief of his being
undercompensated. And I further find that Lines did not meet
his follow-up burden of establishing that any such basis was
merely pretext for discriminatory behavior.

Based upon all the foregoing, I further find that there
is no basis for an award of liquidated damages or attorney's
fees and that the Lines Individual Claim should be disallowed
in full.

Turning to the Mukes Individual Claim -- and, again, a
recap of the claim. The Mukes proof of claim is also lacking
in detail, only asserting that the claim is for damages
allowable under the FLSA. However, in Mukes' response to the
Debtor's claim objection, he provides greater clarity,
asserting that the Debtor violated the FLSA by failing to pay
him overtime of $752.74, and that based upon that he also
asserts that he should recover an additional equal sum as

1  liquidated damages, plus unspecified attorney's fees.

2      For the first time, he also discloses that his individual

3  claim is also filed on behalf of the Nine Mukes Litigation

4  Opt-Ins and that he estimates generalized amounts for each of

5  the nine being roughly $1,500 to $2,000 per individual, to

6  arrive at a total claim of $21,200.

7      First, in relation to Mukes' claim for himself, the

8  evidence demonstrated that Mukes simply miscalculated amounts

9  in concluding that he had not been paid for overtime.  In

10  other words, there is no basis for the allowance of any

11  amount, and thus, correspondingly, no basis for the allowance

12  of any liquidated damages or attorney's fees in relation

13  thereto.

14      As for the Nine Mukes Litigation Opt-Ins, for many of the

15  reasons previously discussed, there was no authority for

16  Mukes to assert a proof of claim on their behalf in his

17  individual claim, not to mention the lack of any disclosure

18  within his proof of claim that that was what he was

19  purporting to do.

20      Even so, even if Mukes would have had the authority to

21  act on behalf of the Nine Mukes Litigation Opt-Ins, there is

22  no evidence that any of the Nine Mukes Litigation Opt-Ins

23  were uncompensated in any way.  In this regard, other than

24  the testimony of Valerie Miller, no evidence at all was

25  introduced in relation to the other eight Mukes Litigation

1    Opt-Ins.  And in the case of Valerie Miller, her testimony

2    simply didn't even rise to the level of a dispute.

3        Accordingly, the Mukes Individual Claim will also be

4    disallowed in full.

5        Turning to the Amazon Logistics Claim, as indicated, on

6    or about March 1, 2015, the Debtor entered into a work order

7    agreement with Amazon Logistics, Inc. for the provision of

8    delivery services.  And that's at Debtor Exhibit 63.

9    Pursuant to the terms the work order, the parties also

10   agreed that the relationship would be subject to and

11   controlled by certain terms of service.  The applicable terms

12   of service are also included as part of Debtor's Exhibit 63.

13       In particular, Amazon asserts, pursuant to Section 9 of

14   the terms of service, which is entitled Indemnification, that

15   it is entitled to be indemnified and held harmless for any of

16   the fees and expenses and potential liability that may be

17   incurred by Amazon in connection with the Lines Litigation.

18       Turning to the language of the indemnification provision,

19   it's broken into two subdivisions.  In Subdivision A, it

20   provides:  You -- being Tenet Concepts, the Debtor -- will

21   defend, indemnify, and hold harmless Amazon and its

22   affiliates and successors and each of their respective

23   directors, officers, and employees, each an indemnified

24   party, and collectively, the Indemnified Parties, from any

25   third-party allegation or claim based on or any loss, damage,

1   settlement cost, expense, and any other liability, including

2   but not limited to reasonable attorney's fees and expenses

3   arising out of or in connection with (1) any allegation or

4   claim of negligence, strict liability, or misconduct of you

5   or your personnel; (2) a breach of these terms, the program

6   policies, or any work order by you or your personnel; (3) any

7   action or inaction by you or any of your personnel,

8   including, without limitation, any and all loss or damage to

9   personal property or bodily harm, including death, or (4) any

10  allegation or claim that you or any of your personnel failed

11  to comply with applicable law.  However, the foregoing

12  indemnification obligation does not apply to the extent that

13  any claim subject to indemnification results from the

14  negligence or willful misconduct of the indemnified parties.

15  That concludes Subpart A.

16      In Subpart B, it goes on to provide:  Your duty to defend

17  is independent of your duty to indemnify.  Your obligations

18  under this section are independent of any of your other

19  obligations under these terms.  You will use counsel

20  reasonably satisfactory to the indemnified parties to defend

21  each indemnified claim, and the indemnified parties will

22  cooperate at your expense with you in the defense.  You will

23  not consent to the entry of any judgment or enter into any

24  settlement without the indemnified parties' prior written

25  consent.

1       As previously indicated, the Amazon Claim has been

2   asserted as partly a liquidated claim and partly an

3   unliquidated and/or contingent claim.  The liquidated aspects

4   of the claim are, in the attachment to the proof of claim,

5   there's an assertion of having incurred legal fees by Littler

6   Mendelson of $29,464 and by Morgan, Lewis & Bockius of

7   $15,528.83 as of the -- I believe it was as of the petition

8   date.  It goes on to simply provide that, to the extent that

9   there are continuing legal fees or costs or liability, that

10  there is an assertion of a claim for those currently

11  unliquidated amounts.

12      The objection that was filed to the claim was filed by

13  Mr. Lines individually and purportedly for similarly-situated

14  -- and for purportedly those similarly situated, including

15  Mukes and Valerie Miller.  Mr. Lines points out that he has

16  alleged in the Lines Litigation that Amazon.com was negligent

17  and/or had itself engaged in misconduct, and that, as a

18  result, the exclusion to indemnification in Part A of Section

19  9 of the indemnification provision should prevent any

20  allowance of the claim.

21      In support, Mr. Lines also argues or emphasizes that the

22  Debtor's only customer and only source of revenue is Amazon,

23  and that in providing services for Amazon the drivers were

24  engaging in certain conduct which might sort of show some

25  sense of uniformity with Amazon in the sense of wearing

1   Amazon clothing and putting Amazon stickers on their cars at

2   one point in time.  And there is also discussion about the

3   whole issue with the tips going through the Amazon

4   application before being transferred to the Debtor.

5       In sum, Mr. Lines points out these things in an effort to

6   argue that Amazon effectively controlled the employment of

7   Mr. Lines and other similarly-situated drivers and exercised

8   control over the payment of, among other things, tips, and

9   that, as a result of the allegations made and the assertions

10  made, that there is no basis for the Debtor to be assuming

11  any liability for Amazon's defense based upon the exceptions

12  set out in Paragraph 9(a) of the indemnification provisions.

13      In making these arguments, Mr. Lines also, as far as

14  focusing on what amounts to a dual employment argument, that

15  Amazon itself was an employer of Lines and similarly-situated

16  drivers as much as the Debtor was, he points to the economic

17  reality test that's set out in the *Goldberg v. Whitaker House*

18  *Coop* case, 366 U.S. 28, a 1961 opinion, which points out

19  that, in determining whether or not an employer-employee

20  relationship exists, that the labeling is not particularly

21  relevant; what it boils down to is an actual necessity to

22  look at the economic reality of the situation.  And then also

23  highlights the *Williams v. Henagan* case, a Fifth Circuit 2010

24  opinion at 595 F.3d 610, which sets out a four-factor test

25  for considering the -- or, I should say, filtering the

economic reality test through the lens of factors and
identifies the four factors as:  (1) whether the putative
employer possessed the power to hire and fire the employees;
(2) whether the putative employer supervised and controlled
the employee work schedules or conditions of employment; (3)
whether the putative employer determined the rate and method
of payment; and (4) whether the putative employer maintained
employment records.

Mr. Lines also points to the fact that the arrangement
that was agreed upon between the Debtor and Amazon was not
predicated on actual expense incurred by the Debtor in
providing delivery services but was based on other metrics,
such as planned routes and the length of those routes and
what have you.

In responding to the claim objection, Amazon asserts,
among other things, that Mr. Lines has effectively conflated
the duty to defend with the duty to indemnify, essentially
effectively jumping the gun, if you will, to conclude that
the mere allegation of any suggestion of negligence or
willful misconduct on the part of Amazon is sufficient to
negate the requirement of the Debtor to provide a defense or
to provide any indemnification.  It also takes issues with
some of the characterization with respect to the compensation
terms, and certainly with respect to the control aspects of
what was alleged.

1      At trial, what was evident to me is that clearly there

2  were certain aspects of the relationship between the Debtor

3  and Amazon that sort of create some semblance of unity in the

4  sense of, being the only customer of the Debtor, it was not

5  surprising that, for example, as they're delivering Amazon

6  products, they might have some Amazon branding that they

7  would use.  While that, I believe, could ostensibly create

8  some serious confusion for the customers, I don't know that

9  that rises to the level of creating any confusion between the

10  Debtor and Amazon, or with respect, for that matter, to the

11  drivers of the Debtor, for the reasons -- other reasons with

12  respect to how the actual management of the Debtor's

13  employees was orchestrated.

14      What became clear from the evidence is that the Debtors

15  did report directly to -- I'm sorry.  The drivers did report

16  directly to Debtor employees.  The dispatchers were Debtor

17  employees.

18      Even though Amazon had the ability to track where the

19  drivers were through GPS technology, just as the Debtors were

20  tracking where the drivers were, this makes sense in context

21  because, in essence, to have a seamless operation, you had to

22  have the warehouse personnel of Amazon in a position to have

23  loaded up and ready to go merchandise for a driver who was

24  returning to the warehouse to pick up a new delivery, just as

25  much as the Debtor needed to have information with respect to

how things were progressing on the delivery routes in order

to assist drivers if they were getting bogged down in traffic

and/or provide assistance through basically realigning

another driver to potentially pick up a delivery if things

were getting bogged down, again, by virtue of traffic or

otherwise.

The fact that Amazon had the ability to track drivers

does not in and of itself reflect any indicia of control with

respect to the Debtor's drivers.  And the evidence was clear

that the Debtor's drivers ultimately were directed by the

Debtor, under the control of the Debtor.  The compensation

was paid by the Debtor.  The terms of the compensation were

dictated by the Debtor.  The recordkeeping with respect to

payments of the Debtor were handled by the Debtor.  The sole

exception relating to the tips issue, and the tips issue was

a function of the fact that tips were handled -- basically,

payments in general were handled through the application, as

opposed to petty cash being given to drivers, which I was

satisfied was explainable by virtue of concerns with respect

to safety of the drivers and also just avoiding having cash

floating around with individuals as opposed to a more secure

methodology of having it go through electronic means in a

modern financial society.

I don't have any indication that was presented to me that

Amazon in any way misrepresented what the tips were that were

1  received and passed along to the Debtor, fraudulently

2  concealed tips that were paid and went through Amazon to the

3  Debtor.  There was obviously a lot of speculation and

4  innuendo, but, frankly, no evidence at all of any

5  misapplication or misappropriation or misconduct on the part

6  of Amazon in this context.

7      Not that it's necessarily particularly relevant to the

8  indemnification provisions, but I was also satisfied that

9  there wasn't a situation where it appeared that the terms of

10 the engagement between the Debtor and Amazon were such that

11 it was creating some sort of undue influence over the

12 Debtor's actions because of being short on cash to be able to

13 pay the drivers, if that makes sense.  I had no indication

14 that the compensation -- in fact, if anything, there was some

15 suggestion that the compensation did provide some level of

16 profit/liquidity to the Debtor sort of above and beyond its

17 costs of operation.

18     More importantly, just looking at the plain provisions of

19 the indemnification provision, while Amazon suggests that

20 essentially the duty to defend may -- or, at least there

21 seemed to be some indication of an argument that the duty to

22 defend not only entitles Amazon to the right to all defense

23 costs being paid on the front end before there's any

24 determination of the actual claims asserted, but sort of

25 immunizes that against any type of reimbursement right in the

1   event that there is a subsequent determination of misconduct

2   on the part of Amazon.

3       I'm not sure that I am prepared to go that far to the

4   extent that that is the suggestion, but that's not really

5   even necessary at this juncture.  The question here is

6   whether or not Section 9 of the terms of service require a

7   duty of defense and for those expenses to be paid pending the

8   outcome of any litigation.  And on that, I do find that the

9   agreement does require a duty of defense and that any

10  suggestion to the contrary just simply based upon allegations

11  in litigation is not supported and an insufficient basis for

12  any kind of disallowance of the Amazon Claim on that basis.

13      Given that that was the -- that those were really the

14  sole nature of the objection to the Amazon Claim, I'm going

15  to overrule the objection to the allowance of the claim on

16  that basis.

17      And at this point, I'm not going to -- because the claim

18  is still, in some respects, unliquidated and contingent, I'm

19  not at this point just going to blanket allow the claim.  I

20  think at some point we're going to have to figure out what to

21  do with that claim to the extent that the agreement is not

22  assumed by the Debtor.  And perhaps it will be assumed and it

23  effectively becomes a moot issue.  But if it's not assumed,

24  then any other bases for objection, once liquidated amounts

25  are asserted or if we ever get to any kind of estimation

1    issue in connection with the claim, the Court is not

2    precluding the Debtor in any way from raising those issues at

3    that time.  But for purposes of what has been asserted so far

4    and for purposes of just the nature of the objection to

5    allowance that has been raised, here being really a textual

6    contractual argument, the Court is not persuaded by that

7    argument and will overrule the objection on that basis.

8        That concludes the Court's rulings with respect to the

9    Claims Objection matters.  As indicated, we'll have to come

10   back with respect to the adversary proceeding.

11       Do the parties have any questions?

12       MS. REA:  Your Honor, what would you like -- what

13   would you like the orders to look like?  For the reasons

14   stated on the record, the claim is disallowed, you know?  Or

15   the claim objection is overruled?

16       THE COURT:  I think that's probably going to be the

17   simplest way to do it.  I'll -- just for purposes of the

18   record, I will, until the entry of the order, reserve the

19   right to supplement any of the bases of my decision.  And so

20   to the extent that there's anything that I have missed that

21   the parties believe need to be in any kind of order, I will

22   certainly consider that in the context of the submission of a

23   proposed order.  But I'm certainly fine with something really

24   simple, just simply saying, for the reasons stated on the

25   record, the claim is *x*.

1          MS. REA:  Okay.  I'll do that and then circulate it

2     to all the parties, including Mr. Lackey.

3          THE COURT:  All right.  Very good.  Anything else?

4          MS. REA:  No.  Thank you.

5          THE COURT:  All right.  I did want to tell you all

6     that I --

7          MR. LACKEY:  No, Judge, thank you.

8          THE COURT:  All right.  I did want to tell you all

9     that the -- I did find that the parties presented the case

10    very well.  You all did an excellent job at trial, and I

11    appreciate that.  And having had more and more experience in

12    court seeing lots of variations of methodology, I appreciate

13    how well you all did and how streamlined and efficient you

14    all were.  Okay?  All right.  Thank you.  The Court will be

15    in recess.

16         MR. GIBSON:  Thank you.

17         THE CLERK:  All rise.

18         MR. LACKEY:  Thank you, Judge.

19       (Proceedings concluded at 3:16 p.m.)

20                          --oOo--
                         CERTIFICATE
21

22        I certify that the foregoing is a correct transcript from
      the digital sound recording of the proceedings in the above-
23    entitled matter.

24        **/s/ Kathy Rehling**                        **05/21/2019**

25    _____      _____
      Kathy Rehling, CETD-444                      Date
      Certified Electronic Court Transcriber

```
 1                              INDEX
                           Excerpt:  Ruling
 2                         2:01-3:16 p.m.

 3   PROCEEDINGS                                          3

 4   WITNESSES

 5   -none-

 6   EXHIBITS

 7   -none-

 8   RULINGS                                             3

 9   END OF PROCEEDINGS                                 44

10   INDEX                                              45

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Service List

**Service List-Plan Solicitation
Tenet Concepts, LLC
#5927**

Tenet Concepts, LLC
8200 Cameron Rd., Suite A198
Austin, TX 78754

United States Trustee
Erin Schmidt, Trial Attorney
1100 Commerce St., Room 976
Dallas, TX 75242

Internal Revenue Service
Centralized Insolvency Operations
PO Box 7346
Philadelphia, PA 19101-7346

Thomas C. Mauriello
1328 Calla Lily Blvd.
Leander, TX 78641

Brent E. Harris
PO Box 157
Goodrich, TX 77335-0157

Lloyd P. Jones, III
916 Cavalry Ride Trail
Austin, TX 78732

David Scott Cass
6041 Country South Lane
Midlothian, TX 76065

BSX Insurance
Cole Walters
3355 W. Alabama
Houston, TX 77098

Protective Insurance Company
Attn: Jeffrey A. Hunt, VP-Programs
111 Congressional Blvd., Suite 500
Carmel, IN 46032

IPFS Corporation
Attn: Rebecca Berlanga
PO Box 730223
Dallas, TX 75373-0223

IPFS Corporation
Attn: Robyn Provost
24722 Network Place
Chicago, IL 60673-1247

Littler Mendelson P.C.
PO Box 45547
San Francisco, CA 94145

McDonald Sanders, LLC
Attn: Russell Davenport
777 Main St., Suite 1300
Fort Worth, TX 76102

Vanbridge LLC
Attn: Mike Fitzsimmons
PO Box 416103
Boston, MA 02241-6103

The Hartford
Attn: Norma Richards
PO Box 660916
Dallas, TX 75266-0916

Advance business Capital, LLC
dba Triumph Business Capital
c/o Jared A. Ullman
Ullman & Ullman, P.A.
7700 West Camino Real, Suite 401
Boca Raton, FL 33433

Triumph Business Capital
c/o Dennis Olson
Olson Nicoud & Gueck, LLP
10440 N. Central Expwy., Suite 1100
Dallas, TX 75231

Accurate Background
7515 Irvine Center Drive
Irvine, CA 92619

ADP, LLC
400 W Covina Blvd.
San Dimas, CA 91773

AT&T Mobility
PO Box 6463
Carol Stream, IL 60197-6463

Austin Printer Repair
1019 W Rundberg Lane, Apt. A
Austin, TX 78758

Before and After Paint Inc.
13626 Ann Louise
Houston, TX 77086

Blue Cross Blue Shield of Texas
PO Box 731428
Dallas, TX 75373-1428

C-Net Technologies
3513 SW H.K. Dodgen Loop, Suite 204
Temple, TX 76502

California Secretary of State
PO Box 944228
Sacramento, CA 94244-2280

California Secretary of State
Franchise Tax Board
PO Box 942857
Sacramento, CA 94257-0511

Capital One
PO Box 71083
Charlotte, NC 28272-1083

Chase Bank
PO Box 15123
Wilmington, DE 19850–5123

Clear Company HRM
PO Box 419189
Boston, MA 02241-9189

Comptroller of Public Accounts
111 E. 17th St.
Austin, TX 78774-0100

Concentra Occupational Health Center
PO Box 488
Lombard, IL 60148-0488

Concentra Occupational Health Center
PO Box 9005
Addison, TX 75001-9005

Contigo Technology LLC
8127 Mesa Dr., Suite B206-122
Austin, TX 78759

Cooper CPA Group, PC
15050 Fairfield Village Dr., Suite 130
Cypress, TX 77433

Dental Select
PO Box 301680
Dallas, TX 75303-1680

Enterprise Fleet Management
PO Box 80089
Kansas City, MO 64180-0089

Enterprise Rent-A-Car/Enterprise Holdings
Damage Recovery Unit
PO Box 843369
Kansas City, MO 64184-3369

FedEx
PO Box 660481
Dallas, TX 75266-0481

First Insurance of CA Funding
450 Skokie Blvd., Suite 1000
Northbrook, IL 60062-7917

Franchise Tax Board
PO Box 942857
Sacramento, CA 94257-0531

Illinois Dept. of Revenue
PO Box 19006
Chicago, IL 62794-9006

Infinisource, Inc.
Attn: Finance Dept.
PO Box 889
Coldwater, MI 49036

Made Affordable Pressure Washing
Attn:  Terrence Dillard
16114 Bowridge Lane
Houston, TX 77053

Metropolitan Property & Casualty
PO Box 783861
Philadelphia, PA 19178-3861

Molano's Hand Wash
11019 Shadowfield
Houston, TX 77064

Picone & Associates Inc.
439 Main St., #5
Islip, NY 11751

Poster Compliance Center
3687 Mt. Diablo Blvd., Suite 100a
Lafayette, CA 94549

Principle Distribution, LLC
8200 Cameron Rd., Suite A198
Austin, TX 78754

Regions Bank
3017 W. 7th St., Suite 410
Fort Worth, TX 76107

Regus - Newark
39899 Balentine Dr., Suite 200
Newark, CA 94560

Regus – Chicago
350 Northwest Hwy., Suite 300
Park Ridge, IL 60068

Regus – Houston
13201 NW Frwy., Suite 800
Houston, TX 77040

Regus – San Antonio
1100 NW Loop 410, Suite 700
San Antonio TX 78213

Scopelitis
Garvin Light Hanson & Feary
10 West Market St., Suite 1500
Indianapolis, IN 46204

~~Stuco Pros LLC~~
~~4544 Prospect Dr.~~
~~House Springs, MO 63051~~

Sunrise Identity
28250 Network Place
Chicago, IL 60673-1283

Texas Mutual Insurance Company
PO Box 841843
Dallas, TX 75284-1843

Travelers CL Remittance Center
PO Box 660317
Dallas, TX 75266-0317

United Fire Group
PO Box 3244
Cedar Rapids, IA 52406-3244

Wageworks Inc.
f/k/a Conexis
PO Box 8363
Pasadena, CA 91109-8363

Chen Xu
c/o William David Turley
The Turley Law Firm, APLC
7428 Trade St.
San Diego, CA 92121

Enterprise Holdings
600 Corporate Park Dr.
St. Louis, MO 63105

Illinois Dept. of Revenue
PO Box 19006
Chicago, IL 62794-9006

Jeffrey Lines
c/o Robert Valli, Jr./S. Kane/James Vagnini
Valli Kane & Vagnini, LLP
600 Old Country Rd., Suite 519
Garden City, NY 11530

Triumph Business Capital
701 Canton Dr., Suite 100
Coppell, TX 75019

WEX Bank
fka Wright Express Fin. Svs. Corp.
PO Box 6293
Carol Stream, IL 60197-6293

Willie J. Mukes
c/o Joe Micah Williams
The Law Offices of Joe M. Williams
8866 Gulf Freeway, Suite 384
Houston, TX 77019

Commerce Bank
PO Box 414084
Kansas City, MO 64141-4084

Jeffrey Lines
c/o Jay D. Ellwanger/Holt Major Lackey
Ellwanger Law LLLP
8310-1 N. Capital of Texas Hwy., Suite 190
Austin, TX 78731

Willie J. Mukes
c/o John Bruster Loyd
Law Office of Jones, Gillaspia & Loyd LLP
4400 Post Oak Parkway, Suite 2360
Houston, TX 77027

Texas Comptroller of Public Accounts
c/o Courtney Hull/Sherri Simpson
Attorney General's Office
Bankruptcy & Collections Div.
PO Box 12548
Austin, TX 78711-2548

IPFS Corporation
Attn: Lisa Chandler
30 Montgomery St., Suite 1000
Jersey City, NJ 07302

Texas Mutual Insurance Co.
6210 E. Highway 290
Austin, TX 78723

Franchise Tax Board
PO Box 2952
Sacramento, CA 95812-2952

EAN Services, LLC
dba Enterprise Rent A Car & National Car
14002 E. 21st St., Suite 1500
Tulsa, OK 74134

Travis Hawks
c/o Keating Law offices, PC
111 West Washington St., Suite 1631
Chicago, IL 60602

Amazon Logistics, Inc.
Attn: General Counsel
410 Terry Avenue North
Seattle, WA 98109-5210

Amazon Prime Now Delivery Drivers
8310-1 N. Capital of Texas Highway
Suite 190
Austin, TX 78731

EAN Services, LLC
c/o Scott R. Larson
Bell Nunnally
3232 McKinney Ave., Suite 1400
Dallas, TX 75204

C.M., a minor child
c/o Paul Wolf
Mitchell Hoffman & Wolf
221 North LaSalle St.
Chicago, IL 60601

Amazon Logistics, Inc.
c/o Darren G. Gibson/Salvador Davila
Littler Mendelson, PC
100 Congress Avenue, Suite 1400
Austin, TX 78701

Jeffrey Lines
c/o David W. Henderson
Ellwanger Law LLLP
8310-1 N. Capital of Texas Hwy, Suite 190
Austin, TX 78731

Aon Affinity Insurance Services, Inc.
Attn: Dolores McGinty
1100 Virginia Dr., Suite 250
Fort Washington, PA 19034